**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **LORA LEE EVERETT** | § | |
| *Plaintiff* | § | |
| | § | |
| **VS.** | § | |
| | § | **CIVIL ACTION NO.**_____ |
| | § | |
| **CITY OF SAN DIEGO, TEXAS AND** | § | |
| **BONNIE SANTOS** | § | |
| *Defendants* | § | |
| | § | **JURY TRIAL DEMANDED** |

---

## PLAINTIFF'S ORIGINAL COMPLAINT

---

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES **LORA LEE EVERETT**, referred to herein as Plaintiff, complaining of Defendants **CITY OF SAN DIEGO, TEXAS** ("City") and **BONNIE SANTOS** ("Officer Santos"), in her individual capacity, hereinafter called Defendants, and for cause of action, would respectfully show unto the Court and jury the following:

### I.
### NATURE OF THE CASE

**THE CLAIM:** City of San Diego, Texas Officer Bonnie Santos used excessive force against Lora Lee Everett in violation of her individual rights under the Fourth Amendment to the United States Constitution when she illegally and brutally tased her on 27 February 2021, without factual or legal cause to do so, after verbally berating Ms. Everett and falsely accusing her of assault. This violence was caused by the City of San Diego, Texas Police Department policies, customs, and/or practices allowing Defendant Santos to make and post several videos, beginning on February 2020, making light of tasing herself or others; allowing Defendant Santos and other City of San Diego officers

1

to utilize City uniforms, equipment, and time in the making of their social media videos; permitting City of San Diego officers to invasively surveil Ms. Everett and her family at their family home by continuously and obviously watching their property, driving by, and even making obscene gestures. Ms. Everett's injuries resulted directly and only from this clearly excessive use of force; and the excessiveness of that force was clearly unreasonable. The actions alleged herein are of such a nature as to shock the conscience and are cruel and unusual in their oppressiveness.

## II.

## PARTIES

1. Plaintiff, **LORA LEE EVERETT** is a resident of City of San Diego, Texas.

2. Defendant **CITY OF SAN DIEGO, TX** is a political subdivision of the State of Texas and the City of San Diego, TX Police Department is an agency operated thereunder.

3. The City of San Diego, TX Police Department is funded and operated by the City of San Diego, TX City Council. Mayor (*position vacant*) or any individual acting as Mayor Pro Tem, is the chief executive of the City of San Diego, TX.

4. Mayor or any individual acting as Mayor Pro Tem, is responsible for implementing the policies and decisions of the City of San Diego, TX City Council as the City's primary administrator.

5. Mayor and the City Council are tasked with appropriating, reviewing, and implementing the City of San Diego, TX Police Department budget, policies, procedures, practices, and customs, including the acts and omissions related thereto, at issue in this lawsuit.

6. Chief Ben Gomez is the Chief of Police of the City of San Diego, TX and the primary policymaker tasked with creating, implementing, and reviewing the City of San Diego, TX Police Department policies, procedures, practices, and customs.

7. The City of San Diego, TX may be served by and through Mayor Pro Tem Jose S. Martinez III, at the City of San Diego, TX City Hall, 404 S. Mier St., San Diego, TX 78384, or wherever he may be found.

8. Defendant **BONNIE SANTOS** is a police officer employed by the City of San Diego, TX Police Department and at all times material herein was a police officer acting in the course and scope of her employment for City of San Diego, TX. She may be served at her place of employment at the City of San Diego, TX Police Department located at 404 S. Mier St.,

San Diego, TX 78384, or wherever she may be found. Defendant Santos is being sued in her individual capacity.

## III.
## JURISDICTION

9. The subject matter in controversy and damages sought are within the jurisdictional limits of this Court.

10. This Court also has jurisdiction over this suit under 42 U.S.C. § 1983.

11. Venue is also appropriate in the Southern District of Texas pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claim occurred in City of San Diego, Duval County, Texas, which is in the Corpus Christi Division of the Southern District of Texas.

## IV.
## FACTS AND ALLEGATIONS

12. On the 27 February 2021, Lora Lee Everett had her constitutional rights violated when she was illegally detained and excessively tased by Defendant, Officer Bonnie Santos of the City of San Diego, TX Police Department.

13. The incident was captured on Defendant's body camera device.

14. In mid-February 2021, the entire state of Texas was beset by a once in a generation freeze, killing dozens of citizens and damaging property, including the electrical system in Ms. Lora Lee Everett's 2007 Chevrolet Corvette.

15. On the day prior to her tasing, 26 February 2021, Ms. Everett, experiencing major issues with her vehicle's electrical system, was forced to access her vehicle through its hatchback. That same evening, she was forced to exit a McDonald's drive-thru because of her inoperable windows and doors.

16. On 27 February 2021, at approximately 10:30 am, Ms. Everett's mother left their family home, headed to her brother's home (Plaintiff's uncle).

17. After providing her pet with its medication, Ms. Everett entered her car through the passenger door, heading to her uncle's home to join her mother.

18. On information and belief, Ms. Everett was driving down S. Flores St., when she was stopped by Defendant Santos at approximately 11:10-11:15 am.

19. When Defendant Santos approached Ms. Everett's vehicle, her demeanor was immediately aggressive and accusatory.

20. Defendant Santos demanded Ms. Everett get out of the vehicle, refusing to accept Ms. Everett's offering of her license and insurance through the driver's side door, which Ms. Everett had opened as far as possible.

21. Rather than being reasonable and listening to Ms. Everett's attempts to explain her literal inability to roll down the window or open the door to its full capacity, Defendant Santos grew increasingly more infuriated and violently flung open Ms. Everett's driver-side door, screaming, "Ma'am when you're on a traffic stop you don't open your vehicle for nothing!... Get off the vehicle! Get off the vehicle! Get off, get off the vehicle! 6104 make my 20!...I am not going to listen to you until you step out of your fucking vehicle."

22. As she yelled at Ms. Everett, Defendant Santos had her right hand rested on the firearm holstered in her duty belt.

23. Ms. Everett, not threatening or menacing Defendant Santos in *any* way, continues futilely attempting to explain that she was heading to her disabled uncle's home to assist her mother in cleaning his front yard.

24. Defendant Santos' anger continued escalating, as she was obviously angered by Ms. Everett's attempts to explain where she was traveling.

25. Frightened by Defendant's inexplicable irascibility and continued escalation of the encounter, Ms. Everett —whose hands were visible the entire time — reaches for her cellphone, which was in the cup holder to her right. Ms. Everett then began to record Defendant Santos to ensure she captured the terrifying ordeal as it unfolded.

26. Ms. Everett then asked Defendant Santos whether she was under arrest, three consecutive times. On information and belief, Defendant Santos responded with something to the effect of, "Get off your vehicle. 6104 make my 20!"

27. Ms. Everett, desperately attempting to deescalate the rapidly worsening situation, again attempted to calmly explain where she was headed to no avail. Defendant Santos exhibited no diminution in her anger whatsoever.

28. Terrified by Defendant's extraordinary anger, Ms. Everett — again, neither menacing nor otherwise communicating that Defendant Santos had any reason to be in fear for her safety — attempted to call her mother, who did not answer the phone, as it had been left in her vehicle.

29. Defendant Santos, on information and belief, is now cursing at Ms. Everett, screaming for her to exit the vehicle. Ms. Everett, debilitated by fear and taken aback by Defendant's extreme anger, places a final phone call, this time to her younger sister, via FaceTime, telling her upon connecting of the FaceTime, "look what she's doing to me."

30. Ms. Everett's sister picks up the FaceTime call and subsequently witnesses Defendant Santos' anger, asking fearfully, "What is happening? What's going on?!"

31. At this point, Defendant Santos is unable to control her anger, and reaches into Ms. Everett's vehicle, attempting to pull her out of the car. Ms. Everett does not strike Ms. Santos and merely tries instead to avoid being hit by Defendant Santos in her wild anger, while leaning over to the center console, conspicuously unarmed and attempting to protect herself.

32. In response to Ms. Everett attempting to shield herself against Defendant Santos, Defendant Santos begins yelling, "Oh now you assaulted me? Get out! Get out of the vehicle now!" Review of the video shows that at no point did Ms. Everett strike or attempt to strike Defendant Santos.

33. On information and belief, Defendant Santos then rips Plaintiff's cell phone out of Ms. Everett's right hand, as she is yelling "Get out of the vehicle now!"

34. Ms. Everett then partially exits her vehicle and exclaims "my phone!," while pointing at Defendant Santos' left hand.

35. Ms. Everett then exits her vehicle and yells out to her younger sister via FaceTime call "I'm near Tac's house. Down the street of Tac's house!"

36. Defendant Santos, now completely blind with rage, continues to instruct Ms. Everett to get out of the car, screaming at the top of her lungs. Defendant Santos is so angry that she does

not realize that as she's yelling for Ms. Everett to get out of the vehicle, Ms. Everett is in fact standing outside of the car.

37. Ms. Everett proceeds to respond to Defendant Santos "I am out of the car!"

38. Defendant Santos then proceeds to tell Ms. Everett "Step that way now!," as she is pointing with her taser to the back of Ms. Everett's car.

39. Ms. Everett raises the same question to Defendant Santos for a fourth time: "Am I under arrest?"

40. Defendant Santos then replies, yelling out to Ms. Everett: "You are now because you assaulted me!"

41. Ms. Everett then replies, "No ma'am you told me…"

42. Then, on information and belief, Defendant Santos responds again with "Get out of the vehicle!," and deploys her taser as Ms. Everett is standing out of the vehicle, mere inches away from the vehicle's gas tank.

43. Ms. Everett is tased as she stands upright and poses no threat whatsoever. She is literally standing upright with her hands by her side, being tased and experiencing excruciating pain as the electricity courses through her body. Ms. Everett began feeling a crawling sensation coming up her throat, and remarks to her sister, "I'm getting tased! Stop! Oh my God!"

44. Immediately thereafter, on information and belief, Defendant Santos threw Ms. Everett's cell phone into oncoming traffic and Defendant Santos demands Ms. Everett to "Get down on the ground!," signaling to the back of Ms. Everett's vehicle.

45. Defendant Santos, on information and belief, continues deploying her taser, with one of the prongs lodging approximately one inch from Ms. Everett's genital area.

46. Ms. Everett, being shocked physically and taken aback by the viciousness of Defendant's brutality, raises her hand to touch her stomach and torso area. As she does, her right thumb and palm are shocked with electricity.

47. Ms. Everett then responds with "I will. I will. I will. Please stop! Please stop, ma'am! Ma'am, I understand! Please stop!"

48. Immediately thereafter, Defendant Santos follows with, "You're gonna get tased again!" "Okay, then you want to get pepper sprayed?!"

49. Ms. Everett states to Defendant Santos, "I have my stuff right here!" referencing Ms. Everett's driver's license and insurance card which she was holding in her right hand since prior to Defendant Santos approaching Plaintiff's car.

50. Defendant Santos continues to order Ms. Everett: "Get on the fucking ground!"

51. At this point, Ms. Everett does not have her bearings completely about her and states "I do not have a gun, I don't have anything!" as she has moved to the space between the back end of her Corvette and the front end of Defendant Santos' police unit, still holding her license and insurance in her right hand.

52. In the meantime, Defendant Santos, on information and belief, is repeatedly yelling "Get on the ground! Get on the ground!" as the tasing continues.

53. Unbeknownst to Ms. Everett, another City of San Diego, TX officer had arrived as she was being shocked. That officer, on information and belief, is Ben Gomez, the current Chief of Police. At that time, on information and belief, he was lower in rank than Defendant Santos.

54. Ms. Everett, in shock and in incredible pain, asks then-Officer Gomez, "What is going on?" Officer Gomez responded, "Just get on the ground! Just get on the ground!"

55. Ms. Everett responded by kneeling onto the pavement with her left knee, at which point, on information and belief, she was taken to the ground and handcuffed.

56. Then-Officer Gomez said, "Let me get you up." Ms. Everett then responded that she could get herself up.

57. Officer Gomez then checked Ms. Everett's cuffs and tightened them. As she's standing against the rear of her vehicle, Ms. Everett can see Defendant Santos going through her vehicle.

58. Officer Gomez turns Ms. Everett around and says "Let me get that," pulling out a metal object from underneath Ms. Everett's left breast. Officer Gomez and Defendant Santos did not radio for medical attention for Ms. Everett.

59. Ms. Everett then yells at Defendant Santos to get out of Ms. Everett's vehicle and asks Officer Gomez to retrieve her cellphone from the road.

60. Ms. Everett is then put into Officer Gomez's unit and transported to the Duval County Jail.

61. Defendant Santos has Ms. Everett's vehicle towed after searching Ms. Everett's vehicle for approximately an hour.

62. After approximately an hour of Ms. Everett being incarcerated, Officer Ben Gomez, presents Ms. Everett a citation for allegedly speeding at 40MPH in a 30 MPH zone. The citation reflected the following information incorrectly: Plaintiff's DOB; the year of Plaintiff's vehicle; and the time and street address where Ms. Everett was tased and arrested.

63. Ms. Everett is then informed by a Duval County Sheriff's Deputy that she has been charged with resisting arrest and assault on a public servant, a Class A misdemeanor and third-degree felony, respectively, under Texas law. Ms. Everett was eventually released from the Duval County Jail.

64. The next day, on 28 February 2021, Ms. Everett went to the Christus Spohn Hospital location in Alice where she was seen for "anxiety about [her] health; reported assault; ***taser injury***; chest wall pain; and elevated CK." CK, or Creatine Kinase MB, is a type of protein found in the heart, brain, and other muscles in the body. The levels often rise within three to six hours after the beginning of a suspect heart attack. This test may be ordered and administered where a patient has chest pain and/or is suspected of having had a heart attack.

65. On or about 5 November 2021, Ms. Everett was wrongfully indicted in Cause No. 21-CRD-114 in the 229th Judicial District Court of Duval County, Texas for the charge of Assault on Public Servant, alleging Defendant Bonnie Santos as the victim. On or about 2 February 2023, the State of Texas by and through its Assistant District Attorney filed a dismissal of said case. The filing of this case led to Ms. Everett's increased anxiety and fear to even operate a motor vehicle.

66. From 27 February 2021 to the present date, the brutal and excessive force by Defendant Santos against Ms. Everett has caused a severe decline in Ms. Everett's mental and physical well-being.

## A POLICY, CUSTOM, OR PRACTICE OF STALKING & HARASSMENT

67. The unjustifiable and brutal tasing of Ms. Everett was not the point where Defendant Santos' terrorizing of her would end, unfortunately. On information and belief, Defendant Santos thereafter engaged in a campaign of invasive surveillance of Ms. Everett and her family, passing by their family home on at least approximately 15 occasions and following various family members, attempting to threaten them by virtue of her continued surveillance:

a. **<u>Wednesday, 3 March 2021 at approximately 6 pm:</u>** Defendant Santos drives east, past Ms. Everett's family home, at a very low rate of speed.

b. **<u>Sunday, 11 April 2021 at approximately 3:50 pm:</u>** Defendant Santos, parked at a nearby vacant home, drives off after being noticed by Ms. Everett, only to return to the vacant property a few minutes later.

c. **<u>Sunday, 3 May 2021 at approximately 8:57 pm:</u>** Defendant Santos or a fellow officer/co-worker of Defendant Santos, on information and belief, is caught spotlighting Ms. Everett's family home with the light from a city-issued City of San Diego police unit.

d. **<u>Wednesday, 11 August 2021 at approximately 8:08 pm:</u>** Defendant Santos was idling at the entrance of Ms. Everett's family home, facing W. 7th St. as Ms. Everett ran to retrieve her cellphone. In response, Defendant Santos then sped off, driving at an accelerated speed down Dr. EE Dunlap Hwy.

e. **<u>Friday, 20 August 2021 at approximately 11:37 pm:</u>** Defendant Santos sat in the same vacant property that she had in April of 2021, with her lights off. Immediately after Ms. Everett's younger sister drove off, Defendant Santos, on information and belief, relocated her vehicle, parking one block over from Ms. Everett's sister's home off Hwy 44.

f. **<u>Wednesday, 1 December 2021 at approximately 10:25 pm:</u>** Defendant Santos was parked at the mailbox of Ms. Everett's family home. As Ms. Everett went to grab her cellphone, Defendant Santos drove off and was observed driving at a very low rate of speed, turning onto S. Louisiana St.

g. **<u>Monday, 6 December 2021 at approximately 2:00 am:</u>** Defendant Santos was at the stop sign across from Ms. Everett's mother's home and proceeded to turn her spotlight onto Ms. Everett's mother's vehicle, keeping it shining on her even once she exited her vehicle and returned to her vehicle. Defendant Santos then followed her in a threatening manner before ultimately doing a U-turn on Dr. EE Dunlap and driving away.

h. **<u>Sunday, 19 December 2021 at 11:22 pm:</u>** Ms. Everett and her family were installing surveillance equipment on their home in response to the repeated sightings of Defendant Santos. Defendant was caught on camera, on information and belief, driving down Dr. EE Dunlap Hwy. Defendant shut off all light on her unit, including those in the interior, and exits her unit. At some point, on information and belief, Defendant Santos remarks something to the effect that she's in that area to "watch you," in reference to Ms. Everett

and/or her family. Thereafter, Defendant attempts to trespass onto the Everett's property, claiming she is on public property.

i.     **Friday, 24 December 2021 at 3:27 am:** Defendant Santos followed Ms. Everett's uncle as he drove off from Ms. Everett's family home.

j.     **Sunday, 26 December 2021 at 11:40 am:** Defendant Santos is observed parked at a nearby vacant property with her unit parked such that she had a clear view of Ms. Everett and her family home.

k.     **Monday, 27 December 2021 at 9 pm:** Defendant Santos drove by Ms. Everett's family home as she and her family were outside celebrating. Ms. Everett went to retrieve her cellphone to record Defendant Santos and recorded her making a U-turn and speeding off down Dr. EE Dunlap Hwy.

l.     **Saturday, 8 January 2022 at 8:30 am:** Defendant Santos followed Ms. Everett's mother from the east entrance of San Diego on Hwy 44 until Ms. Everett's mother turned onto S. Flores St., a distance of approximately 1.5 miles, and the very location where nearly a year earlier, Defendant Santos tased Ms. Everett without legal cause or justification.

m.     **Sunday, 9 January 2022 at 12:45 pm:** Defendant Santos was traveling one direction down the road, hit a U-turn, and then followed a dear friend of Ms. Everett's mother's as she was driving off from her visit to their home.

n.     **Sunday, 1 April 2022 at 2:48 pm:** A male officer in a black City of San Diego, TX Police Department unit drives by Ms. Everett's family home as Ms. Everett is outdoors; rolls down his window; and proceeds to give Ms. Everett the middle finger.

## V.
## CAUSES OF ACTION

### COUNT ONE - EXCESSIVE FORCE
**Violation of the Fourth Amendment Pursuant to 42 U.S.C. §1983 Against Defendant Santos**

68.  Ms. Everett repeats and re-alleges each and every allegation contained in the above paragraphs as though fully delineated below.

## *Resisting Arrest & Speeding: The Law*

69. Codified under Section 38.03 of the Texas Penal Code, the law on resisting arrest is as follows:

> **(a) A person commits an offense if he intentionally prevents or obstructs a person he knows is a peace officer or a person acting in a peace officer's presence and at his direction *from effecting an arrest, search, or transportation of the actor* or another by using force against the peace officer or another.** Tex. Pen. Code, §38.03 (1994) (emphasis added).

70. Codified under Section 543.004 of the Texas Transportation Code, **speeding, the use of a wireless communication device, and a violation of the open container law, are all offenses where an officer is mandated (i.e., the law reads "shall") to issue a citation to an alleged offender instead of arresting them.** (emphasis added).

71. For clarity, reasonable suspicion "must be supported by particular and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant an intrusion…The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized…'hunch.'" *Goodson,* at 736 (citing *United States v. Michelet*, 13 F.3d 838, 840 (5th Cir. 1994) (en banc)).

72. Probable cause, by contrast, "is present when the totality of the circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Id.*, at 740 (citing *Vance v. Nunnery*, 137 F.3d 270, 276 (5th Cir. 1998 (quoting *United States v. Levine*, 80 F.3d 129, 132 (5th Cir. 1996)).

73. Accordingly, Defendant Santos had no reasonable suspicion to detain Ms. Everett beyond the time necessary to issue her a citation for the alleged speeding offense. She also had no reasonable suspicion that she had committed any other crime both at the time she tased her or at any point thereafter.

74. Defendant Santos had **no reason whatsoever** to demand Ms. Everett out of the car or do **anything** other than issue her a citation and send her on her way.

75. Defendant Santos **most definitely** had no justification whatsoever for using force of any kind, let alone less-than-lethal force of the magnitude inflicted by an electronic control device (ECD) or taser.

76. Defendant Santos, acting under color of law, deprived Ms. Everett of the rights and privileges secured her by the Fourth and Fourteenth Amendments to the United States Constitution to be free from illegal and unreasonable seizures by the use of force.

77. Accordingly, Ms. Everett commences this action pursuant to 42 U.S.C. § 1983.

78. "In order to present a successful claim of excessive force under § 1983, the plaintiff must show (1) an injury; (2) that resulted directly and only from a use of force that was excessive to the need of force; and (3) that the use of force was unreasonable under the circumstances." *Sullivan v. Allred,* 297 Fed. Appx. 339, 342 (5th Cir. 2008) (citing *Ramirez v. Knoulton,* 542 F.3d 124, 128 (5th Cir. 2008), *Bush v. Strain,* 513 F.3d 492, 501 (5th Cir. 2008), and *Freeman v. Gore,* 483 F.3d 404, 416 (5th Cir. 2007) (citing *Tarver v. City of Edna,* 410 F.3d 745, 751 (5th Cir. 2005)(see also *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016)).

79. Ms. Everett was unquestionably injured in her tasing by Defendant. Her injury was visible, on scene, as she reacted in a manner evincing pain, as well as to the physicians at the Christus Spohn Hospital – Alice emergency room on the next day. As the Fifth Circuit has opined, "the eggshell skull rule is applicable in 42 U.S.C. § 1983 cases," recognizing that "a tortfeasor [ — here, Defendant Santos —] takes [her] victim as [s]he finds [her]." *Darden v. City of Fort Worth, Texas,* 880 F.3d 722, 731 (5th Cir.), *cert. denied sub nom. City of Fort Worth, Tex. v. Darden,* 139 S. Ct. 69, 202 L.Ed. 2d 23 (2018). (citing *Dunn v. Denk*, 54 F.3d 248, 251 (5th Cir. 1995), *rev'd on other grounds* 79 F.3d 401 (5th Cir. 1996) (en banc); *see also Koch v. United States*, 857 F.3d 267, 274 (5th Cir. 2017).

80. With respect to the injury, significant injury is not required, per se; however, the injury must be "more than de minimis." *Hanks v. Rogers*, 853 F. 3d 738 (5th Cir. 2017), (citing *Tarver v. City of Edna*, 410 F.3d 745, 752 (5th Cir. 2005) (citing *Harper v. Harris County, Tex.*, 21 F.3d 597, 600 (5th Cir. 1994)), but "the injury must be more than *de minimis*," (citing *Santos v. Bramer*, 180 F.3d 699, 703 (5th Cir.1999)).

81. Ms. Everett's injury resulted directly and only from a use of force that was excessive to the need of force, to wit: being tased when she was not posing any threat to Defendant, *visibly and obviously* unarmed, and under no legal duty whatsoever to get out of her vehicle, as the attempted detention was completely uncalled for under the circumstances, particularly as Defendant Santos never alleged that she developed probable cause to search Ms. Everett's vehicle or arrest her for another offense.

82. The excessiveness of the force was clearly unreasonable, particularly considering Ms. Everett was not only not posing a threat to Defendant, but she was literally just sitting in her car when she was accosted. She was not taking or making any aggressive stances, movements, or actions when Defendant Santos decided to unjustifiably put hands on her and ultimately tase her.

83. "The relationship between the need and the amount of force used" must be considered and assessed by the officers using force to "effectuate [a] subject's compliance." *Newman v. Guedry,* 703 F.3d 757, 763 (5th Cir. 2012) (quoting *Deville v. Marcantel,* 567 F.3d 156, 167 (5th Cir. 2009) (see also, *Hanks v. Rogers*, 853 F. 3d 738 (5th Cir. 2017)).

84. ***An officer tasing, striking, or otherwise violently slamming an arrestee who is not actively resisting arrest is a constitutional violation***. *Darden v. City of Fort Worth, Texas,* 880 F.3d 722, at 731 (5th Cir.), *cert. denied sub nom. City of Fort Worth, Tex. v. Darden,* 139 S. Ct. 69, 202 L.Ed. 2d 23 (2018)(emphasis added).

85. Fifth Circuit case law establishes that the degree of force an officer can employ is reduced when an arrestee is not actively resisting arrest. *Id.*

86. Ms. Everett was not actively, passively, or otherwise resisting arrest when forcefully accosted and tased by Defendant Santos.

87. In determining whether the officer's use of force was "objectively reasonable," courts utilize a three-factor test outlined in the seminal Supreme Court case *Graham v. Connor:*

 a. *Severity of the crime;*

 b. *Immediate threat;* and

 c. Whether the subject is *actively resisting* or *attempting to evade arrest by fleeing.* *Graham v. Connor,* 490 U.S. 386, 396 (1989).

88. Analyses surrounding whether a particular use of force was objectively reasonable require "a careful balancing of the nature and quality of the intrusion on the individual's…interests

against the countervailing governmental interests at stake…[requiring] careful attention to the facts and circumstances of each particular case." Seth Stoughton, et al., Evaluating Police Uses of Force (2020) (citing *Graham v. Connor*, at 396).

89.  "Reasonableness" is judged from the perspective of a *reasonable officer on the scene*, as opposed to with the "20/20 vision of hindsight." *Ibid* (citing *Graham v. Connor*, at 396)(emphasis added).

90.  Under *Graham,* courts are charged to rely on what a "reasonable officer" would have perceived, irrespective as to whether the officer *actually* perceived it that way. *Ibid* (citing *Graham v. Connor*, at 396).

91.  As to the three elements of the *Graham* objective reasonableness test, **none** of the three factors is satisfied in favor of Defendant.

92.  At the point Defendant perceived Ms. Everett, she was allegedly merely speeding. She had not been accused of a crime for which she could be removed from her vehicle or implicated in any crime above the alleged Class C misdemeanor of speeding. As such, there is **no** severity of any crime because no crime whatsoever for which she could be arrested had allegedly been committed.

93.  Consequently, no force **whatsoever** was justified. However, **even if** Ms. Everett had committed resisting arrest— a misdemeanor under Texas law — the Fifth Circuit has said that the "severity" factor of *Graham v. Connor* "militated against the use of force where the alleged crime was a misdemeanor," rendering Defendant's use of force wholly unjustified and excessive. *Reyes v. Bridgwater*, 362 F.App'x 403, 407 n.5 (5th Cir. 2010).

94.  The other two factors, however, also weigh heavily against Defendant Santos.

95.  Ms. Everett was not an immediate threat, as she was merely sitting in her car as she was accosted and tased. She made no aggressive movements towards Defendant and had a cell phone — visibly **not** a weapon — in her hand. She did not even verbally berate or disrespect Defendant. She was relatively calm throughout the entire encounter, remarking only that Defendant could take her license and insurance information and inquiring why she was being treated so aggressively.

96.  Ms. Everett was also not actively or passively resisting Defendant or attempting to flee or evade arrest. She was sitting in her car by herself before being accosted and tased. Even after Defendant began accosting her, Ms. Everett did not fight or resist her, despite

Defendant falsely claiming she assaulted her. She was most certainly not attempting to flee either.

97.  The fact that no crime besides speeding had been committed or even suspected and Ms. Everett was not a threat whatsoever makes it clear that Defendant's belief that force was needed and the accompanying use of force were completely unreasonable and the force completely excessive. As the Fifth Circuit opined in *Hanks*, "a reasonable officer on the scene would have known that suddenly resorting to physical force as [Defendant Santos] did would be clearly excessive and clearly unreasonable." *Hanks*, at 745.

98. The *Hanks* court opined further, noting "…clearly established law demonstrated that an officer violates the Fourth Amendment if [s]he abruptly resorts to overwhelming physical force rather than continuing verbal negotiations with an individual who poses no immediate threat or flight risk, who engages in, at most, passive resistance…" *Id.*, at 747.

99.  Ms. Everett suffered physical injury, pain, and mental anguish as a direct result of the brutal and excessive force used against her.

100.    Defendant Santos caused Ms. Everett to endure extraordinary pain and suffering by accosting her and tasing her multiple times without cause or justification.

101.    These injuries were only caused by this accosting and tasing and not by any other means.


## COUNT TWO
### § 1983 *Monell* Claim against City of San Diego, Texas

102.    Plaintiff incorporates by reference all of the foregoing and further alleges the following:

103.    The conduct of Defendant Santos constituted unlawful, unreasonable excessive force against Ms. Everett without legal cause or justification.

104.    At all material times, Defendant Santos acted under color of state law, as an agent of the City of San Diego, Texas.

105.    Defendant Santos was acting within the course and scope of her duties as a City of San Diego, TX Police Department officer when she brutally accosted and tased Plaintiff

Everett. At all times relevant to this lawsuit, Defendant Santos was clad in her City of San Diego, TX Police Department-issued uniform.

106.    Chief Juan Garcia was and now Chief Ben Gomez is the Defendant's policymaker for all matters related to the City of San Diego, TX Police Department, having been delegated the policymaking authority by the City of San Diego, TX City Council.

107.    Consequently, the City of San Diego, TX had or ratified the following policies, customs, and/or practices in place when Defendant Santos attacked Ms. Everett:

**a.**  Allowing Defendant Santos to make and post several videos, beginning in February 2020, making light of tasing herself or others;

**b.**  Allowing Defendant Santos and other City of San Diego officers to utilize City uniforms, equipment, and time in the making of their social media videos; and

**c.**  Permitting City of San Diego officers to invasively surveil Ms. Everett and her family at their family home by continuously and obviously watching their property, driving by, and even making obscene gestures.

108.    Chief Garcia and/or Chief Gomez and his command staff were all deliberately indifferent to the natural byproducts of this policy, practice, and/or custom, of which he was aware, authorized, ratified, accepted, exacerbated, and encouraged, instead of rectifying it and ensuring civilians were not hurt by it.

109.    It was clear that a constitutional violation was a very likely outcome of the ratification, adoption, and promotion of this policy, particularly with respect to the policy, custom, or practice of allowing jokes about the use of less-lethal ECD (taser) devices.

110.    Chief Garcia and/or Chief Gomez and his command staff knew or should have known that allowing Defendant Santos to make and post several videos making light of tasing herself or others; allowing City of San Diego officers to utilize City uniforms, equipment, and time in the making of their social media videos; and/or permitting City of San Diego officers to invasively surveil Ms. Everett and her family home would result in citizens being detained or arrested illegally and subjected to unjustifiable force.

111.    This policy, *supra*, was actually known, constructively known, and/or ratified by City of San Diego, TX and its policymakers, including Chief Juan Garcia and/or Chief Ben Gomez, and was promulgated with deliberate indifference to Ms. Everett's rights under the United States Constitution and the rights of all others making contact with City of San

Diego, TX officers. The policymakers of the City of San Diego, TX Police Department knew that their officers would continuously be put in situations wherein constitutional violations like those aforementioned in this complaint would occur. These policies made it highly likely that such constitutional violations as those previously described would occur, under color of state law. The previously mentioned policies were a moving force of Ms. Everett's constitutional deprivations and injuries, causing her to experience physical and mental injury and suffer damages.

## VI.
## THE POLICIES IN ACTION

112.     The first two policies — (a) allowing Defendant Santos to make and post several videos, beginning in February 2020, making light of tasing herself or others and (b) allowing Defendant Santos and other City of San Diego officers to utilize City uniforms, equipment, and time in the making of their social media videos — are shown demonstrably in the morass of TikTok videos uploaded by Defendant Santos between 2020 and 2023.

113.     **Sgt. Bonnie Santos, TikTok Star:** Defendant Santos is, on information and belief, an avid TikTok user, boasting approximately 12.5k followers and 62.3k likes. The entirety of her TikTok videos are available at the following link: https://www.tiktok.com/@bonniesantos6.

114.     The literal first video on her TikTok page is one wherein she jokes about having tased herself while showing off her taser.[5]

---

[5] https://www.tiktok.com/@bonniesantos6/video/6797937020992851205?is_from_webapp=1&sender_device=pc&web_id=7204223513883805227.



(ILLUSTRATION A)

115.     In another video posted on the same day, Defendant Santos posts a video of her
engaged in what appears to be a training exercise in a school gymnasium. The caption reads
"That head shot lol," and features her punching and using her baton against a padded suit-
clad simulated attacker.[6]

116.     In another video, Defendant Santos yet again shows off her baton technique against
a padded suit-clad simulated attacker.[7]

117.     In another video uploaded to Defendant Santos' Tik Tok account, a man named
"Gilbert" — believed to be a City of San Diego, TX police officer — is seen showing off
his baton skills. Defendant Santos refers to him as "Gilbert the rabbit" in her comments on
the video.[8]

118.     The next few videos feature training sessions presumably showing off City of San
Diego officers' and their skills against padded attackers and presumed colleagues with pad-
ded shields.

119.     A video posted on 8 March 2020 shows Defendant Santos (presumably) painting a
set of handcuffs pastel pink.[9]

---

[6] https://www.tiktok.com/@bonniesantos6/video/6797938119665601797?is_from_webapp=1&sender_de-
vice=pc&web_id=7204223513883805227.
[7] https://www.tiktok.com/@bonniesantos6/video/6800162153673346309?is_from_webapp=1&sender_de-
vice=pc&web_id=7204223513883805227
[8] https://www.tiktok.com/@bonniesantos6/video/6801141682642488582.
[9] https://www.tiktok.com/@bonniesantos6/video/6801934983465372934.

120.     In a video posted on 9 March 2020, Defendant Santos brags about being a taser instructor in the caption and shows herself utilizing the taser on presumed colleagues whose faces are covered by emojis.[10]

121.     In a video posted on 10 March 2020, Defendant Santos brags about receiving training on the use of pepper spray. One of the hashtags she uses in the description is "#pain."[11]

122.     In another video from 10 March 2020, Defendant Santos brags again about being a tasing instructor, demonstrating her tasing technique on a colleague whose face is covered with an emoji.[12]

123.     In another video posted on the same day, Defendant Santos tases a presumed colleague as he is lying prone on the ground. As she discharges the taser, the colleague writhes in pain and shrieks, "Ooooooooooh!"[13]



(ILLUSTRATION B)

124.     In a video posted on 13 April 2020, Defendant Santos serenades the camera, clad in CGI bunny ears and nose and with a modulated voice. She is in uniform and in what appears to be a police unit.[14]

---

[10] https://www.tiktok.com/@bonniesantos6/video/6802098364193230085.
[11] https://www.tiktok.com/@bonniesantos6/video/6802579161702550789
[12] https://www.tiktok.com/@bonniesantos6/video/6802643530985557254
[13] https://www.tiktok.com/@bonniesantos6/video/6802701629159165190
[14] https://www.tiktok.com/@bonniesantos6/video/6815172659018566917.

125.    In a video posted on 18 July 2020, Defendant Santos appears to have filmed two of her male colleagues, as both are clad in City of San Diego uniforms as they mess around in what appears to be their office.[15]

126.    In a video posted on 25 July 2020, Defendant Santos loads and cleans her duty weapon and taser. The caption reads, "Nice and clean now who wants to play haha."[16]



(ILLUSTRATION C)

127.    In a video posted on 2 November 2020, Defendant Santos jokes about wanting to tase herself because she has to drive an hour home after a long shift. She actually displays and initializes the taser in this video.[17]

128.    In a video posted 5 November 2020, Defendant Santos posts a video of one of her lieutenants showing some kids how to stop drop and roll. One of the comments she posts to the video reads, in part, "just wait till he finds out there's a video and it's on TikTok…"[18]

[15] https://www.tiktok.com/@bonniesantos6/video/6850690323048434950.
[16] https://www.tiktok.com/@bonniesantos6/video/6853613771487759621.
[17] https://www.tiktok.com/@bonniesantos6/video/6890748745084931334.
[18] https://www.tiktok.com/@bonniesantos6/video/6891840713303133446.



(ILLUSTRATION D)

129.     In a video posted 7 November 2020, Defendant Santos jokes about the dispatcher potentially being asleep and how she's "ready to bounce off some walls…chase after people…"[19]



(ILLUSTRATION E)

130.     In a video posted 12 November 2020, Defendant Santos is being filmed by what seems to be two colleagues as they joke about her wanting donuts and mistaking a Krispy Kreme truck for EMS.[20]

---

[19] https://www.tiktok.com/@bonniesantos6/video/6892488050664836357.
[20] https://www.tiktok.com/@bonniesantos6/video/6894113372464221446.

131.    In a video posted 13 May 2021, Defendant Santos is filming a colleague who is clad in a City of San Diego PD uniform. She jokingly attempts to hand him a Snickers bar, which he swats away.[21]

132.    In a video posted 9 November 2021, Defendant Santos, in response to comments about the length of her nails says in almost prescient fashion, " If someone gets injured in the process of me doing my job, well, then that will be on me at that time."[22]



(ILLUSTRATION F)

133.    In a video posted 13 May 2022, Defendant Santos posts a video where the only subject in the video is Chief Ben Gomez, as he places a sticker on a taillight.[23]

[21] https://www.tiktok.com/@bonniesantos6/video/6965373679714782469.
[22] https://www.tiktok.com/@bonniesantos6/video/7028586360034512175.
[23] https://www.tiktok.com/@bonniesantos6/video/7097420742190484778.



(ILLUSTRATION G)

134.      In a video posted 28 June 2022, Defendant Santos jokes about not eating and having to fight some of the same people (presumably subjects she contacted that day) again. She concludes her video talking about biting into a scorching hot piece of pizza, closing out the video with the remark, "…*and I still didn't get to tase anyone*."[24]

135.      In a video posted on 10 July 2022, Defendant Santos displays the City of San Diego, TX Police Department engaged in active shooter drills. The Chief of Police, Mr. Ben Gomez, can be seen prominently displayed near the end of the video.[25]



---

[24] https://www.tiktok.com/@bonniesantos6/video/7114514933982727467. (emphasis added)
[25] https://www.tiktok.com/@bonniesantos6/video/7118973123046722862.

(ILLUSTRATION H)

136.     In a video posted 22 December 2022, Defendant Santos films The Chief of Police, Mr. Ben Gomez, as he plays with his phone and the video turns him into a cartoon character.[26]



(ILLUSTRATION I)

137.     ***In this instance, the City of San Diego, TX Police Department policy of allowing Defendant Santos to make so many videos about tasing or otherwise harming subjects and using her equipment was known to the City – as its policymaker participated in such videos – and was allowed to continue on, both then and now, with enthusiastic adoption This policy caused harm to Ms. Everett because had the City curtailed such action, Defendant Santos likely would not have been on the street to tase her or would have her ability to use such devices revoked.***

138.     The policy of allowing City of San Diego, TX Police Officers to use their uniforms, units, and equipment in the making of social media videos is clearly on display, as evidenced by the preceding twenty-six (26) paragraphs. The City of San Diego was not only aware of such a policy, custom, or practice before and after Ms. Everett sustained injury; its policymakers enthusiastically adopted and ratified the policy every time they participated in the filming of such videos utilizing such department-issued property.

---

[26] https://www.tiktok.com/@bonniesantos6/video/7179659883178954030

139.    The policy permitting invasive surveillance of Ms. Everett and her family has caused her and them harm because it has grossly eroded the safety and security they are able to enjoy in their home and the community of which they have been an integral part for generations. The ability to utilize public roads and lands to harass, follow, and tacitly threaten the citizens you are sworn to serve and protect creates an ever-present fear and concern that physical harm would follow the mental anguish and trauma such surveillance creates.

## VII.

## QUALIFIED IMMUNITY UNDER § 1983

140.    City Employees may be entitled to qualified immunity as to their individual liability. That immunity is waived, however, upon a showing by the Plaintiff that:

a.    The individual's acts deprived the party of constitutional rights under color of law;

b.    The deprived rights were clearly established, constitutional rights in existence at the time of the acts complained of; and

c.    Such acts were not objectively reasonable under the circumstances, that is, no reasonable official could have believed at the time that the conduct was lawful.

141.    "In 'an obvious case,' [*Graham v. Connor*] and [*Tennessee v. Garner*] may supply the "clearly established law." *Hanks v. Rogers*, 853 F.3d 738, 747 (5th Cir. 2017) (citing *Mullenix v. Luna*, 136 S.Ct. 305, 308, 193 L. Ed. 2d 255 (2015)) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004) (*per curiam*)); *see also Cooper*, 844 F.3d at 524. This case is an obvious case of excessive force and violation of the Fourth Amendment right against unreasonable searches and seizures, because Ms. Everett was merely suspected of committing a Class C offense (speeding); Defendant had developed no reasonable suspicion that she had committed any crime beyond that Class C accusation; and Defendant had developed no probable cause to arrest her for any crime, search her vehicle, or use force, making the brutal and excessive force used completely unjustifiable.

142.    Defendant Santos, acting under color of state law, enforcing the policies, customs, and/or practices of the City of San Diego, TX Police Department, deprived Ms. Everett of

her civil liberties, without due process of law, by accosting and tasing her unlawfully and unreasonably with clearly excessive force.

143. The Fifth Circuit has, in denying qualified immunity for officers, "placed weight on the quickness with which law enforcement personnel have escalated from negotiation to force." *Brothers v. Zoss*, 837 F.3d 513, 520 (5th Cir. 2016). The Court opined further to that end in the *Hanks* case, noting that "our case law clearly established that [the officer] should have continued to verbally negotiate — including by threatening force, if necessary — rather than abruptly resorting to 'actual' physical force." *Hanks*, at 748.

144. No reasonable official could have believed that accosting and tasing Ms. Everett was lawful, let alone humane or remotely appropriate in this circumstance. "Any reasonable officer should have realized that [Officer Santos's unlawful, unreasonable tasing and illegal detention of Ms. Everett] offended the Constitution." *Taylor v. Riojas*, 141 S.Ct. 52, at 54 (2020).

145. The Fifth Circuit has also recognized a citizen's right to be free from unlawful restraint in *Trammel v. Forge*. In that case, the court instructed that the "central concept [with respect to qualified immunity] is that of 'fair warning:' the law can be clearly established 'despite notable factual distinctions' between the precedents relied on and the case then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Trammel v. Forge*, 868 F.3d 332, 339 (5th Cir. 2017).

146. The acts of Defendant Santos were unreasonable under the circumstances when viewed objectively.

147. Defendant Santos was deliberately indifferent to the excessive risk of harm to Ms. Everett in the actions she took. Such acts deprived Ms. Everett of and violated her clearly established constitutional rights and were not objectively reasonable.

148. The acts of Defendant Santos clearly violated established rights under the Constitution and statutes. A reasonable person would have known that Ms. Everett's constitutional rights of protection against unreasonable searches and seizures were enshrined by the Fourth Amendment to the Constitution and that Defendant Santos' actions were violative of such rights.

149. The acts of Defendant Santos were salient in their wrongness and grossly offensive. Only an officer violating the law or who is plainly incompetent would perform such an act as accosting and tasing a subject on whom she has neither reasonable suspicion beyond a Class C speeding offense nor probable cause to detain or arrest, let alone subject to physical force.

Thus, Defendants are liable to Plaintiff for the damages caused by their actions, which were the direct and proximate causes, in each count alleged above respectively, of Ms. Everett's injuries.

## VIII.
## <u>DAMAGES</u>

150. Ms. Everett repeats and re-alleges each and every allegation contained in the above paragraphs as though fully delineated below.

151. Plaintiff seeks monetary relief and for judgment of all the other relief to which she deems herself entitled.

152. Ms. Everett's injuries were foreseeable and directly and proximately caused by the excessive force used against her.

153. Ms. Everett is thus entitled to recover all actual damages allowed by law. The Defendant's conduct shows malice, wanton disregard, and reckless or callous indifference to Plaintiff's constitutional rights.

154. As a direct and proximate result of the occurrence underlying this lawsuit, Ms. Everett suffered:

  d. Physical injuries, including impairment;
  e. Physical pain and suffering;
  f. Deprivations of her liberty;
  g. Emotional distress, torment, and mental anguish; and
  h. Reasonable and necessary medical care to treat her injuries in the past and future.

155. Plaintiff seeks to recover reasonable attorney's fees and costs of court, and hereby requests the award of punitive damages, pursuant to 42 U.S.C. § 1983 and § 1988.

## IX.
## <u>ATTORNEY'S FEES</u>

156. If Plaintiff prevails in this action, by settlement or otherwise, Plaintiff is entitled to and hereby demands attorney's fees under 42 U.S.C. §1988.

# X.

## JURY DEMAND

157. Plaintiff respectfully requests a jury trial in this matter.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that judgment be rendered against all Defendants, for an amount in excess of the jurisdictional minimum of this Court.

Plaintiff further prays for all other relief, both legal and equitable, to which she may show herself justly entitled.

Respectfully Submitted,

**WEBB CASON & MANNING, P.C.**
710 Mesquite Street
Corpus Christi, Texas 78401
Telephone:     (361) 887-1031
Facsimile:     (361) 887-0903


_*/s/ Matthew S. Manning*_
MATTHEW S. MANNING
State Bar No.: 24075847
Southern Dist. ID No. 3504172
General Correspondence Email:
E: matt@wcctxlaw.com

ATTORNEY FOR LORA LEE EVERETT